## SUPREME COURT.

### AMY BILLINGS agt. CLAUDIUS BAKER, PERRY P. BILLINGS and others.

The acts of 1848 and 1849, "for the protection of estates of married women," *entirely abrogate* the existence of prospective *tenancy by the curtesy*, and were intended to do so. (*See Hurd* agt. *Cass,* 9 *Barb.* 366; *and Clark* agt. *Clark,* 24 *Barb.* 581, *adverse.*)

The effect of these statutes is, that the useless and ridiculous fiction of "tenancy by the curtesy of England," is abrogated, and no longer remains to disfigure the system of common law, or the republican institutions of this state.

*Saratoga Special Term, March,* 1858.

MOTION to amend a complaint by striking out the name of Perry P. Billings, as a defendant. The action is for partition of real estate, which came to the plaintiff by inheritance since the act of 1848, amended in 1849, " for the more effectual protection of the property of married women." Perry P. Billings is the husband of the plaintiff, and was made a defendant under the impression that as the husband of the plaintiff, and by the birth of issue, he had an inchoate interest, as tenant by the curtesy. On the trial before the referee, one of the defendants was sworn as a witness, on his own behalf. The plaintiff was

---

Billings agt. Baker and others.

---

then advised that her testimony became important in the action in her own behalf, but that she was an incompetent witness by reason of her husband's being a party. Perry P. Billings then conveyed or released all his interest in the said estate, to a third party, " and especially his interest, present and future," as tenant by the curtesy, as husband of Amy Billings, so that he be forever barred of all claim as such tenant. Such third person then released and conveyed all that interest to the plaintiff. She then makes this motion to enable her to be a witness in her own behalf.

H. W. Merrill, *for plaintiff*.
C. S. Lester, *for defendants*.

Potter, Justice. The facts set forth in the moving affidavits, sufficiently show that it would be in furtherance of justice to grant this motion; if the interest of the defendant Perry P. Billings, does not make him a necessary party to the action. If the husband has either a present or a prospective interest, he is a proper and necessary party to the action, and the motion could not be granted. That the husband was in such case at common law, tenant by the curtesy initiate, is certain, and that he is such in regard to all estate owned, or acquired by the wife prior to the statutes of 1848 and 1849, if the marriage was also prior to that time, is equally certain. If those acts have by necessary implication abrogated prospective tenancy by the curtesy, it no longer exists. Tenancy by the curtesy, is, " when a man marries a woman seized at any time during the coverture of an estate of inheritance, in severalty, in coparcenary, or in common, and hath issue by her, born alive, and which might by possibility inherit the same estate as heir to the wife, and the wife dies in the lifetime of the husband; he holds the land during his life, *by the curtesy of England*." (4 *Kent Com.* 27.) The Revised Statutes (1 *Rev. Stat.* 754, § 20) expressly recognize the existence of this estate, and provide that, " the estate of a husband, as tenant by the curtesy, shall not be affected by any of the provisions of this chapter."

Four things are necessary to constitute this estate, viz: 1st. Marriage. 2d. Actual seizin of the wife. 3d. Issue born alive; and 4th. Death of the wife. (4 *Kent Com.* 29.) The common law vested this estate in the husband *immediately upon the birth of a child.* (2 *Black. Com.* 127.)

If the reasons for the introduction of this peculiar feature of the common law called "tenancy by the curtesy," in estates in land, have ceased to exist; if in practice the law fails to be useful; or if it had become an evil, or is inapplicable to our American system of law; it presented a reason, perhaps a necessity, for a *remedial act* to abrogate it—and such remedial statute must then be construed with reference to a condition of things thus presented. One of the reasons for the introduction of this estate into the English system, was that the husband being the natural guardian of his child, was entitled to the profits of the land *in order to maintain the child;* but a more prominent and important idea of the system was, the reason that then existed in England, in regard to all estates in land under the feudal law, to wit: that the husband having become dignified by having an interest in lands, was bound to do homage to his superior lord; and the interest being once vested in him, it was the policy of the feudal system not to suffer it to determine during the life of the husband, as otherwise the lord might lose the homage that was his due from the land. *To this estate the husband never had any natural right.* (*Bac. Abr.* Tenant by the Curtesy.)

Sir J. JEKYL says: "This estate has no *moral foundation* to support it." (*Green. Cruise, tit.* 5, § 3.) Crabb, an English writer, says: "The term *curtesy* is derived from *courtesie*, latin *curialitas;* to signify suavity or urbanity, to denote that the custom sprung from *favor* to the husband, rather than from any *right.*" By thus becoming the vassal or tenant of his superior lord, he was permitted "*by the curtesy of England,*" to attend his lord's court, or *curtis*, (as it was called,) and to do him homage, by reason of having become the husband of a wife who had died possessed of an estate in lands after issue born. Such were the reasons for the introduction of such a title to lands

into the law of England. This common law was adopted into our system in this state, by the 35th section of the constitution of 1777. This examination of its history, and the reasons of its adoption, seemed to be necessary in order to ascertain—first, whether such reasons continue to exist; and next, the applicability of such a law to our own local system; and lastly, whether these causes may not have had an influence in determining the *intent* of the legislature, either in continuing or in abrogating this feature of law in regard to real estate, by the acts of 1848 and 1849, above referred to.

There is no doubt that the legislature had the power either to modify or abrogate this *estate* at their pleasure, if it was regarded as public policy so to do. It was so held in *Sleight* agt. *Reed*, (18 *Barb.* 165,) and *Moore* agt. *Mayor of New-York*, (4 *Seld.* 114.) "It is not," says DENIO, J., "a part of the marriage contract which cannot be affected or impaired by statute, but it stands on the foundation of positive law, as one of the institutions of the country." From this, we see, 1st. That the legislature had power to abrogate this estate as to all prospective cases. 2d. That every reason for the introduction of this estate into our system of law, except only that of *the maintenance and support of the children*, is entirely inapplicable to the public policy of this country, and to the institutions of this state. And 3d. That the provisions contained in those acts, were intended to introduce a most important, if not an entire change in the existing law of this state in that particular. The question then is, have future estates of tenancy by the curtesy, been abrogated by those acts?

The answer to this question depends mainly upon the construction to be given to (what seems to be) the very plain language of the act. In determining such construction, we must be guided by those sound rules of interpretation, which long experience and the settled wisdom of the courts have uniformly approved. This, as has been said, is to be regarded as a *remedial statute*, and its language is to be so construed as to give effect to the end the legislature had in view, and if possible to prevent a failure of the remedy intended.

(1 *Kent Com.* 465.)   What then, was the mischief felt, that was the occasion of, or created the necessity for this statute? What was the object intended to be effected by it?   Experience had shown, that the only sensible reason for the introduction of this tenure into real estates, to wit: *the maintenance of the children*, had sadly failed of its object.   The estate was not only alienable, but was also *liable to the payment of the husband's debts*.   And it was found that in too large a proportion of cases, worthless, spendthrift and intemperate husbands, instead of using the estates intended for the support, maintenance and education of their children, exhausted them upon *themselves*, during their own lives, too frequently leaving the children objects of public care.   What was the remedy?   Let then this statute first speak for itself.   The first section of the act of 1848, provides for the ·estates of females who may thereafter marry.   It provides that her estate, real and personal, and the rents, issues and profits thereof, *shall not be subject to the disposal of her (future) husband, nor be liable for his debts, and shall continue her sole and separate property, as if she were a single female.*

The second section was intended to carry out the same provision as the first, in relation to estates of *married* women.   It has been already judicially passed upon in various reported decisions; but its application to the property of the wife who was married at the time of the passage of the above act, is not a question necessary to be examined here, except so far as it goes to show the *intent* of the legislature.

The third section as amended in 1849, provides that any married female may take by inheritance, or by gift, grant, devise or bequest, (from any person other than her husband,) and hold *to her sole and separate use*, and convey and devise real and personal property, *and any interest or estate therein*, and the rents, issues and profits thereof, *in the same manner and with like effect as if she was unmarried*, and the *same* shall not be subject to the *disposal of her husband, nor liable for his debts*.

The next section of the act of 1849, authorizes trustees who hold estates in trust for married women, to convey such estate

to them, subject to certain regulations, for their *sole and sepa-rate use and benefit.* It might here be sufficient to inquire whether the estate of a female before marriage is not absolutely hers for life, forever—without condition—without qualifica-tion—and subject by law to be inherited directly from her by heirs ? It is so, beyond all question ; whatever estate she *then* has in it, by the first section of the act of 1848, *shall continue* her sole and separate property, *as if she were a single female.* This could not be, if any person can acquire an *interest* in it. If the intent of a statute is to be construed in the same man-ner as the intent in a devise or settlement, the case of *Heath* agt. *Greenbank*, (3 *Atk.* 695,) is in point. The testator in that case, devised an estate to trustees, " to and for the sole and separate use of his daughter Mary, wife of William Winsmore, *during her life and at her disposal, and not to be subject to the debts, power or control of her husband.*" And, though a husband was entitled to a curtesy in a trust estate, yet Lord HARDWICKE said : " The father, whose estate it was, has made the daughter a *feme sole*, and has given the profits to her *separate use*; there-fore, what seizin could he, (the husband,) have during the coverture? *He could neither come at the possession, nor the profits.* To admit that the husband was seized, would be directly contrary to the father's *intent.*" And he held that the husband could not have curtesy. What single quality or in-cident that constitutes a tenancy by the curtesy, is left, or re-mains to the husband under this act ? A tenancy by the cur-tesy, vested on the birth of a child. (2 *Black. Com.* 127 ; 2 *Cow. R.* 440.) This quality is now destroyed. It was an es-tate liable to be sold on execution, to pay the husband's debts. (*Schermerhorn* agt. *Clute*, 2 *Cow. R.* 439.) This quality is also destroyed. The husband as tenant by the curtesy, could alien and convey such estate. He has no such power now. One of the requisites to constitute this estate was a marriage. This statute cuts off this constituent in its creation in advance, and expressly declares the wife *shall continue to hold to her sole and separate use, as if she were a single female.* So long as she lives, therefore, the marriage in respect to this estate, does him no

good, for the estate cannot begin during her life. Lord COKE says: " Albeit the estate be not *consummate* till the death of the wife, yet the estate hath a *beginning in the life of the wife.*" (*Co. Lit.* 30 *a.*) And when she is dead, as there has been no such estate to begin, at her death there is none to be consummated. Actual *seizin* of the wife was another constituent quality of this estate. By such seizin of the wife, the husband became seized of *his* interest therein. This quality is also abrogated. Formerly the seizin of the wife, became the seizin of the husband and wife, now it is a seizin for herself alone. By the provisions of this statute, there is not left to the husband one quality that is required to constitute a tenant by the curtesy initiate, nor one incident of the estate that he can enjoy. How then, can it exist? It may be said, indeed, that since the passage of that act, so far as regards all prospective estates, a tenancy by the curtesy initiate is a legal impossibility. Death of the wife changed the tenure from a tenancy by the curtesy initiate, to a tenancy by the curtesy consummate. Now there is no such tenure to be consummated or changed. As a tenancy by the curtesy *initiate,* cannot exist or begin, how can the latter estate be consummated from it? How is it *now* to be constituted? If it *can* now be constituted, the legal definitions of its character must be changed, new qualities must enter into its composition, and a new definition must be prepared to describe it. And for what purpose, under our system of laws, and with our republican institutions? What one single argument can now be produced in favor of its usefulness, as a reason for retaining it? We have here no lords to whom we are bound to render homage. We are all equal peers. A citizen here receives no new dignity by holding an interest in lands. The maintenance and support of the child, which was a reason for the introduction of such an estate, is more certain now by directly inheriting from the mother, than to be dependent upon a father, whose dignity and importance consist in the fact of having been the husband of a wife who had an estate in lands.

The language of this act is entirely inconsistent with the

idea that there is a tenancy for life existing in another person. Is there any such tenure or right as tenancy by the curtesy, attached to the estate of a *single* female? And does not this statute in the most express language declare, that the wife holds this estate, "as if she were a single female?" How then does he acquire a right in it? Does not the same statute declare, that this estate, "*shall not be subject to the disposal of her husband?*" What estate? Not his estate, but her estate; he has none in it. Is this estate, which was hers absolutely, and which the statute says shall so continue, limited to her for her life? By what law? The legislature had no power to limit an estate that was absolutely hers. How then, does the husband acquire any rights to it? By the omission to give it to anybody else? Are estates to land, acquired by omissions in this way? He acquires no statute right to it. *He has no natural right to it* by common law. (2 *Bac. Ab.* title *Tenant by the Curtesy.*)

The effect of this statute then is, that the useless and ridiculous fiction of "*tenancy by the curtesy of England,*" is abrogated, and no longer remains to disfigure the system of common law, or the republican institutions of this state. Nor is the argument ended here. There are negative words enough in this statute alone, to settle this question of intent, without going farther, to wit: "This estate (of the wife) *shall not be subject to the disposal of her husband.*" If after her death, it becomes his by this English fiction, would it not in the very face of the statute, be *subject to his disposal?* "*Nor be liable to his debts,*" says the statute. If he has the use of it for his life, could he not pay his debts with it? Is this old remnant of an obsolete system still to be regarded as stronger than the negative language of an applicable, remedial statute? If this excrescence of another age was regarded as an evil by the legislature, is it to be supposed that they stopped half way, when attempting to apply the remedy of abrogation?

I think it more important at this day, that the courts should adhere strictly to the sensibly expressed intention of the legislature, than that they should permit old maxims applicable

only to ancient observances of an obsolete system of feudual tenures, to control the construction of our own abrogating statutes. Our rights, under remedial statutes, ought to rest upon a surer basis than this. Even in England, it was held, that in case of a *remedial* act, everything is to be done in the advancement of the remedy that can be given consistently with any construction that can be put upon it. (*Johnes* agt. *Johnes*, 3 *Dow.* 15.) Nor is the view I have taken of the construction of this statute, without high authority. In *Westervelt* agt. *Gregg*, (2 *Kern.* 211,) DENIO, J., said: "I am constrained to believe that the true meaning of the section is, (§ 2 *act* of 1848,) that all property which the wife owned at the time of the marriage, and that all such as she had acquired by gift, devise or otherwise, during the coverture, but before the passing of the act, should thereafter be deemed to be vested in her as though she was a *feme sole, to the exclusion of any title which by the pre-existing laws the husband had acquired in it, by virtue of the marriage relation.*" To understand the whole intent of the legislature, the whole three sections of the act of 1848, must be read together, and by such a reading no doubt can remain of the intent. We are at least bound to suppose, that the legislature employed in this act such language as would most directly and aptly express the object they had in view ; that they intended what they said, and the court, instead of looking beyond the act for a constitution to limit or cripple its remedial intent, will best discharge their duty by giving to words that obvious meaning, which is consistent with the common understanding of them. Why, if it was not the clear intent of the legislature to abrogate the tenancy by the curtesy, did they by section 2 of the act of 1849, authorize trustees holding estates for married women, to convey them to such married women ? It was doubtless only upon the theory that she was to be *sole owner.* If by such conveyance, the husband acquired a vested interest in the estate, the very object of the trust estate might be thus defeated. I cannot be made to doubt, upon the considerations above expressed, that the legislature intended to make, and did make, an entire and radical change in the law applicable to the

condition of things as they exist here; a change demanded by the highest considerations of public policy, dictated by demands of the purest benevolence, and resting upon a sound basis of practical good sense. It is a consistent and reasonable statute, suited to the genius and spirit of the age, and to the wants and institutions of a country whose laws lay claim to the basis of equality of rights. It is entitled to fair judicial construction, having reference to the existing mischief, and to the intended remedy, divested of the clogs to progress, by a veneration for any of the ancient relics of feudalism. It would fail of being the remedial statute intended, if it did not remove the unjust disabilities of the wife, arising from coverture, and substitute in some degree, a sensible, living practical equality, for the exploded fiction that the legal existence of woman, as well as her estate, is merged in a husband by marriage; nor only that, but that her own subsistence for her life, as well as the support and maintenance of her children after her death, of an estate derived perhaps solely from her, are put at more than the peril of loss, that a husband, whether worthy or worthless, may be dignified by its control. We have already seen that the reasons for its introduction into a system of law, no longer exist. There is found no such superiority in the husband in regard to a provident management of estates, that demands its longer continuance.

Divesting then, this question as I do, of all reference to common law tenures, which were intended to be abrogated, and construing this remedial statute by the light of its own plain intent as manifested in its clear and express language, the parties in interest are restored to their natural rights. What are they? The right of independent existence, the right to enjoy property, and the right to a certain support and maintenance of her children, are as strong by nature, and have as high a claim to consideration and protection upon public justice, as the claims of the husband's superior dignity. The very spirit of our government is, and it should be of our system of laws, that the rights of *each* citizen to support and protection, whether infant or adult, whether male or female, husband or

wife, shall stand upon an *equality*, and the power of any one so to control the rights or interests of another, as to annihilate or destroy them, should be subject to the control of law. The courts for a long period, had been gradually relaxing the rigid rules of law, in order to aid married women in the protection of their estates, against improvident husbands. And equity, especially, has been prompt to uphold marriage settlements, devises and conveyances in *trust* for them until " *a wife's equity*," had become an institution of the country. (*Sleight* agt. *Reed*, 18 *Barb*. 162.) And the civil law, still more reasonable, ever regarded the husband and wife as being separate and distinct persons in regard to their estates. (2 *Story Eq. Jur.* § 1368.) And as authority to sustain the interpretation of this statute which I have given, I find it laid down as a rule, that even in legal estates, unless the husband had possession during the coverture, so as to be in the receipt of the rents and profits, he was not entitled to curtesy. (1 *Bright on Husband and Wife*, 120.) So too, in the settlements of estates upon the wife, when the intention manifestly appears in the deed of settlement, that the husband should have no interest in the estates so settled upon the wife, she is converted into a *feme sole* during her life. In such cases, whether the equitable inheritance devolve to her as heir, or by limitation immediately, or after intermediate limitations, her husband will not be entitled to curtesy, and if it be a trust to be carried into effect in equity, the court will so model the decree as to prevent curtesy. (1 *Bright on Husband and Wife*, 137.)

With all my veneration for the common law, whenever its existence is found to be inconsistent, not only with the just and equal rights of a class of citizens, but in direct conflict with our remedial statutes, when I find its existence has neither a *natural* nor a *moral* basis to sustain it, I must find a more solid reason for its retention, than the ancient custom of rendering homage to a superior lord, in order to create any reverential awe that shall restrain from an examination as to its usefulness, or hesitation about construing a statute *sensibly*, for fear of derogating from the ancient glory of that system.

I have come to the conclusion above expressed, but I admit not without much embarrassment, on account of the highly respectable authorities deciding the same question the other way. The case of *Hurd* agt. *Coss*, (9 *Barb.* 366,) *per* MASON, J., at special term, and *Clark* agt. *Clark*, (24 *Barb.* 581,) *per* MARVIN, J., also at special term, the latter, however, basing his opinion mainly on the former. But what is a little singular, the last authority cited by Justice MARVIN, is directly against the conclusion he himself arrives at, to wit: *Crabb on Real Property*, § 1106. In his conclusion, he also says: " If the legislature had intended to deprive the husband of his rights by the curtesy, when the wife had not conveyed or devised the estate, it should have so expressly declared in the act." With all deference, I think if the legislature after passing an act, which in its express terms did take it away, had intended still to retain it in the system, *they would have said so*, as they did in the 1*st Rev. Stat.* 754, § 20, in which such a reservation seemed to be necessary, in order to secure it from abrogation. I find no reported general term decisions directly upon the question. I find nothing in the case of *Colvin* agt. *Carrier*, (22 *Barb.* 372,) in conflict with the views I have expressed, but on the contrary, much to sustain them ; that case holds that the estates of the wife under the acts of 1848 and 1849, are her separate *legal* estates. The case of *Sleight* agt. *Reed*, (18 *Barb.* 159, 164, 165,) I regard also as sustaining my views. The case of *Shumway* agt. *Cooper*, (16 *Barb.* 560,) is also cited by the defendant's counsel on their side. This is a general term decision in the 5th district. I have read the very able opinion of Justice ALLEN, in that case, and find that this question did not arise there at all. It was the rights of a husband under the statute of *distributions*, not the common law rights of a tenant by the curtesy, that were discussed in that case. That statute gives the husband as administrator, the right to his wife's personal estate. (2 *Rev. Stat.* 98, § 86, (79).) That statute, it was held in that case, was not *repealed* by the acts of 1848 and 1849, but was modified in this particular, that the wife possessed the power during her life, to dispose of her personal estate, which

if she failed to do, the husband took as before under the statute. There is a case, (*Benedict* agt. *Seymour*, 11 *How. Pr. R* 176, 177,) which so far as it goes, sustains my views, though the question of tenancy by the curtesy, did not directly arise in the case. The conveyance from Perry P. Billings to his wife would be ineffectual to change his interest if he ever had any. By the plaintiff's getting the whole estate again, his rights would again attach.

The motion must be granted on the payment of costs of opposing the motion, it being a motion for a favor.